## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARL D. NEFF, | |
| Plaintiff, | |
| v. | Civil Action No. 20-03531 (KBJ) |
| MURIEL BOWSER, *et al.*, | |
| Defendants. | |

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Defendants the District of Columbia and Mayor Muriel Bowser (collectively, the District) oppose plaintiff's motion for preliminary injunction and summary judgment, and cross-move for summary judgment or, in the alternative, to dismiss all claims in plaintiff's Amended Complaint.[1] LCvR 65.1(c); Fed. R. Civ. P. 56(a), 12(b)(6).

Plaintiff challenges legislation temporarily suspending eviction actions in the Superior Court of the District of Columbia (Superior Court), and seeks an order declaring unconstitutional four provisions of District law (collectively, the Moratorium), along with injunctive relief preventing implementation of the

---

[1]     Although the Parties agreed to brief cross-motions for expedited summary judgment, plaintiff has not expressly addressed his damages claim in his motion. *See generally* [6] and [6-1] (Mem. Supp.). Accordingly, the District also seeks summary judgment under Rule 56, or dismissal under Rule 12(b)(6), of plaintiff's claim for damages.

Moratorium, and damages for property destruction allegedly caused by his tenant. The Moratorium prohibits the filing of eviction actions, D.C. Code § 16-1501(b); delays the effective date of summonses, *id.* § 16-1502; prohibits certain evictions during a public health emergency, *id.* § 42-3505.01(k)(3); and prohibits service of notices to vacate, *id.* § 42-3505.01(q). Plaintiff argues that the Moratorium violates his right to access courts, and the Contracts Clause, and that it effects a physical taking without just compensation in violation of the Takings Clause. As discussed in the attached memorandum, plaintiff is not entitled to a preliminary injunction or summary judgment, and the Court should enter judgment for the District on all of plaintiff's claims.

Plaintiff's claims for declaratory and injunctive relief should be dismissed because he lacks standing to seek such relief. The only relevant injury he alleges is a present inability to evict his tenant, but it is unclear whether each of the legal provisions he challenges in this suit actually poses an obstacle. More importantly, the injury plaintiff seeks to remedy is not likely to be redressed by any relief from this Court. Plaintiff wants to evict his tenant but, as he admits, even if this Court grants the requested relief, he would still need to pursue evictions in Superior Court and the tenant will be able to contest the action.

Even if plaintiff has standing, his claims fail on the merits. The Moratorium does not infringe upon plaintiff's right to access courts because the right depends on an existing cause of action. Legislatures may—and regularly do—make changes to causes of action, such as those at issue here, without violating the Constitution. The

Moratorium does not violate the Contracts Clause because it does not substantially impair plaintiff's protections or his tenant's obligations under the lease—he could file a breach of contract claim for the alleged property damages today—and, in any event, the law reasonably advances legitimate public policy goals. Finally, the Moratorium does not effect a temporary physical taking as alleged, because plaintiff invited his tenant to occupy the property, subject to the terms of District law. Even if the Moratorium were a taking, plaintiff is not entitled to the remedies he seeks because the proper remedy for a temporary taking is just compensation, defined as diminution in market rental value, not prospective relief or consequential damages.

The Court should deny plaintiff's motion for preliminary injunction and summary judgment and grant the District's cross-motion for summary judgment or, in the alternative, to dismiss plaintiff's Amended Complaint. Proposed orders are attached.

Dated:  February 5, 2021.        Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Mateya B. Kelley*
MATEYA B. KELLEY [888219451]
MICAH BLUMING [1618961]
Assistant Attorneys General
ANDREW J. SAINDON [456987]

Senior Assistant Attorney General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
Phone: (202) 724-7854
Fax: (202) 730-0626
mateya.kelley@dc.gov
micah.bluming@dc.gov
andy.saindon@dc.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARL D. NEFF, | |
| Plaintiff, | |
| v. | Civil Action No. 20-03531 (KBJ) |
| MURIEL BOWSER, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................... 2

   I.   The COVID-19 Pandemic .................................................................... 2

   II.   Negative Consequences of Evictions ................................................. 5

   III.   The District's Response ...................................................................... 8

   IV.   Plaintiff's Claims ............................................................................... 10

LEGAL STANDARD ........................................................................................ 12

   I.   Federal Rule of Civil Procedure 12(b)(6) ....................................... 12

   II.   Federal Rule of Civil Procedure 56 ................................................. 12

   III.   Preliminary Injunction ..................................................................... 12

ARGUMENT ..................................................................................................... 13

   I.   Plaintiff's Claims for Prospective Relief Are Not Justiciable. ....... 13

     A.   Plaintiff Lacks Standing To Seek Prospective Relief ................ 13

       1.   Plaintiff's Alleged Injury Is Not Certainly Impending. .......... 14

       2.   Plaintiff's Alleged Injury Is Not Redressable by This Court. ................ 15

     B.   The Court Should Abstain from Deciding the Constitutional Challenge to § 42-3505.01(k)(3) Because It May Be Avoided Under State Law. .......... 18

   II.   Plaintiff's Claims Fail on the Merits. .............................................. 19

     A.   Plaintiff Has Not Been Denied Access to Courts Because the Right of Access Does Not Dictate Underlying District Law. .................................. 19

     B.   The Moratorium Does Not Violate the Contracts Clause. ......................... 22

       1.   The Act Does Not Substantially Impair Plaintiff's Lease. ..................... 23

       2.   The Act Reasonably Advances a Compelling Public Interest. .............. 28

     C.   The Takings Clause Does Not Entitle Plaintiff to Relief. ......................... 33

       1.   The Act Does Not Effect a Physical Taking Because Plaintiff Invited His Tenant To Occupy His Property. ..................................................... 33

       2.   Prospective Relief Cannot Be Granted for a Taking. ............................ 35

       3.   Plaintiff Is Not Entitled to Consequential Damages. ............................ 36

   III.   Plaintiff Is Not Entitled to a Preliminary Injunction. ................... 37

     A.   Plaintiff's Claims Are Not Likely To Succeed on the Merits. ................... 37

     B.   Plaintiff Failed To Demonstrate That He Will Suffer Imminent Irreparable Harm Absent Court-Ordered Relief. ...................................... 38

     C.   The Balance of the Equities and Public Interest Counsel Against Injunctive Relief. ..................................................................................... 40

CONCLUSION..............................................................................................................44

## INTRODUCTION

Plaintiff Carl Neff, a housing provider, wants to evict his tenant. He brings this suit against the District of Columbia and Mayor Muriel Bowser (collectively, the District), claiming that legislation passed by the Council of the District of Columbia (the Council) temporarily suspending evictions in the Superior Court of the District of Columbia (Superior Court) during the current public health emergency violates his constitutional right to access the courts, violates the Contracts Clause, and effects a taking without just compensation. He challenges four provisions of law, which operate to prohibit certain evictions during the ongoing public health emergency, prohibit service of notices to vacate and filing of complaints for eviction, and delay the effective date of summonses for eviction actions (collectively, the Moratorium). Plaintiff seeks a declaratory judgment that the Moratorium is unconstitutional, an injunction prohibiting its implementation, and "damages as a result of the unconstitutional taking."

Plaintiff's claims for declaratory and injunctive relief should be dismissed because he lacks standing to seek such relief. Plaintiff's only alleged injury, with respect to standing, is his present inability to evict his tenant. But it is far from clear whether every piece of the Moratorium actually poses an obstacle. Even assuming that all components of the Moratorium apply to plaintiff's case, plaintiff admits that invalidating them would not remedy his alleged injury; he would still need to prosecute an eviction action in Superior Court, which his tenant could defend, and that action may or may not succeed.

Even if plaintiff has standing on all claims, the District is entitled to summary judgment or dismissal on the merits. Temporarily altering a statutory cause of action as the Council did here does not violate plaintiff's right to access courts because that right depends on the existence and terms of an underlying claim. The Moratorium also does not violate the Contracts Clause because it does not substantially impair leases and, in any event, was drawn in a reasonable way to advance legitimate (indeed, compelling) public purposes—namely, to save lives by slowing the spread of COVID-19 and to mitigate the effects of potential mass evictions following an historically precipitous economic recession. Finally, the regulation does not effect a physical taking because plaintiff invited his tenant to occupy the premises, and the Supreme Court has squarely held that regulations altering the terms of a landlord's invitation do not effect physical takings. Even if the regulation did effect a temporary physical taking, the remedy would be damages based on the property's market rental value, not the injunctive relief and consequential damages plaintiff seeks. The Court should deny plaintiff's motion for a preliminary injunction (PI) and summary judgment, and grant the District's cross-motion for summary judgment or dismissal on all claims.

## BACKGROUND

### I.   The COVID-19 Pandemic

According to the U.S. Department of Health and Human Services (HHS), a nationwide public health emergency, resulting from the 2019 Novel Coronavirus, has existed since January 27, 2020. Defs.' Statement of Undisputed Facts Sup. Cross-

Mot. for Summ. J (SUMF) ¶ 1. On March 11, 2020, the World Health Organization declared COVID-19, the disease caused by the novel coronavirus, to be a pandemic. *Id.* ¶ 2. That same day, Mayor Bowser declared a public health emergency in the District, which now extends through at least March 31, 2021. *Id.* ¶¶ 3, 4.

According to the Centers for Disease Control and Prevention (CDC), "COVID-19 presents a historic threat to public health," the likes of which have not been seen in approximately 100 years. *See* Temporary Halt in Residential Evictions to Prevent Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020) (CDC Moratorium). The virus "spreads very easily and sustainably between people who are in close contact," and may be spread by individuals exhibiting no symptoms. SUMF ¶ 5. "Severe" cases may require hospitalization or intensive care and may be fatal. *Id.* Ballooning case numbers threaten to overrun hospital and health care systems in hot spots nationwide. *See, e.g.*, Presidential Proclamation, Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 13, 2020); Mayor's Order 2020-103, at 2. To slow the spread of the virus, public health officials advise that individuals should maintain physical distance from other people and further advise that those confirmed or suspected of infection should maintain total isolation. SUMF ¶ 6.

In response to this threat, "Federal, State, and local governments have taken unprecedented or exceedingly rare actions, including border closures, restrictions on travel, stay-at-home orders, mask requirements, and eviction moratoria." *Id.* ¶ 7.

From March 30, 2020 to May 29, 2020, for example, the Mayor ordered all District residents to remain in their homes except for limited outings. *Id.* ¶ 8.

"Despite these best efforts, COVID-19 continues to spread … ." CDC Moratorium, 85 Fed. Reg. at 55,292. As of February 2, 2021, the virus has infected 26,160,210 people and killed 441,831 within the United States. *Id.* ¶ 9. More than 37,000 District residents have tested positive for the virus, and at least 916 have died. *Id.* ¶ 10. And even more contagious variants have recently appeared in the area. *See* Michael Schaffer, *The Scary New Covid Variant Has Made It to Maryland*, Washingtonian (Jan. 12, 2021), *available at* https://tinyurl.com/y2h2epzm.

The pandemic has also had profound economic effects. Since March 2020, businesses in the District and across the country have been intermittently shuttered or operated at limited capacity while customers and clients voluntarily avoid public places where the virus may spread. *See, e.g.*, Mayor's Order No. 2020-067;  U.S. Chamber of Commerce, "July 2020 Small Business Coronavirus Impact Poll" (July 29, 2020), https://tinyurl.com/y42xsudn; *Apartment Assoc. of Los Angeles v. Los Angeles*, Civil Action No. 20-5193, 2020 WL 6700568, at *2 (C.D. Cal. Nov. 13, 2020). The percentage of District residents unemployed more than doubled from 5.1% in February 2020 to 11.7% in April 2020. SUMF ¶ 11. Across 2020, the U.S. economy experienced its largest contraction since 1946. *See* U.S. Bureau of Economic Analysis, 2020 (Advanced Estimate) Comparisons, at 3 (Jan. 28, 2021), *available at* https://tinyurl.com/y3z8ccno (comparing annual GDP).

4

## II.   <u>Negative Consequences of Evictions</u>

Before the public health emergency, housing providers in the District could initiate summary eviction actions in Superior Court under D.C. Code § 16-1501, subject to the conditions and restrictions set forth in D.C. Code § 42-3505.01. *See*, *e.g.*, *Pernell v. Southall Realty*, 416 U.S. 363, 365 (1974) (explaining that the "statutory cause of action now codified in [D.C. Code §] 16-1501 dates back to 1864"); *Suggs v. Lakritz Adler Mgmt., LLC*, 933 A.2d 795, 797-98 (D.C. 2007) (rental housing laws first enacted in 1974 replaced landlords' ability to evict for any reason with a legal regime under which the landlord must "show that he had gained the right to evict the tenant under D.C. Code § 42-3505.01").

Even under normal circumstances, a single eviction can have devastating, generational consequences on an individual family. *See* Ex. E, D.C. Council, Public Roundtable Regarding Tenant Protection and Eviction Prevention, Sept. 14, 2020 (statement of Beth Mellen Harrison), *available at* https://tinyurl.com/yxfc4o94 (citing Matthew Desmond, Evicted: Poverty and Profit in the American City (2016)) (Mellen Testimony). "[E]viction is a cause, not just a condition, of poverty." Mellen Testimony at 6 (SUMF ¶ 12). The filing of an eviction action alone can make it very difficult for tenants to secure new leases because many landlords will not rent to persons who have had an eviction filed against them. SUMF ¶ 13. Mass evictions could result in displacement of entire communities from the District and add to the devastation of neighborhoods where housing instability and evictions are already concentrated. Mellen Testimony at 2-3, 8; Ex. H, Brian J. McCabe *et al.*, McCourt School of Public

Policy, "Eviction in Washington D.C.," at 14-21 (Fall 2020), *available at* https://tinyurl.com/y5lykvfr (McCourt Report).

The COVID-19 pandemic only amplifies these risks. Because physical distance and isolation remain the primary methods of preventing the spread of COVID-19, housing instability poses an especially serious threat to the health of affected tenants and communities. *See, e.g.*, CDC Moratorium, 85 Fed. Reg. at 55,294-55,296. Large numbers of individuals living in any single setting facilitates the spread of the virus. *Id.* As a result, "evictions threaten to increase the spread of COVID-19 as they force people to move, often into close quarters in new shared housing settings with friends or family, or congregate settings such as homeless shelters." *Id.* (SUMF ¶ 15).[1] The same is true for tenants who may self-evict, before engaging in any formal proceedings. *See* SUMF ¶ 18. And, for those who are evicted and unable to find shelter, living on the streets further increases the risk they will experience a severe reaction to COVID-19. SUMF ¶ 16.

Empirical studies examining the relationship between COVID-19 and eviction controls have shown that eviction moratoria reduce the spread of COVID-19 and

---

[1]   There is ample reason to believe this is as true in the District as across the country. A recent study of all eviction filings in Superior Court between 2014 and 2018 indicates that most District tenants facing eviction are in low-income housing: approximately a quarter of all households facing eviction have subsidized housing, and nearly two-thirds owe less than the median rent ($1,487) in the District when they are summoned to court. SUMF ¶ 20. If these tenants were to be evicted, or if they self-evicted, *see* SUMF ¶ 18, they would very likely need to share housing with family or friends. This is so for many reasons, including the difficulty of securing a new lease if they have lost work or income, and the scarcity of subsidized and low-income housing in the District, *see* SUMF ¶ 21. The eviction filing itself can also prevent acquisition of new leases. SUMF ¶ 13.

related deaths. SUMF ¶ 32. The research also indicates that moratoria on eviction notices and filings more effectively curb the spread of COVID-19 than do prohibitions limited to later-stage proceedings such as the execution of eviction orders. *Id.* ¶ 33.

Absent government intervention, tens of thousands of District residents would face eviction today. In recent years, the Superior Court's Landlord and Tenant Branch docket has exceeded 30,000 eviction cases annually. SUMF ¶ 17. Without an adequate response, the pandemic was expected to increase eviction filings significantly as a result of precipitous losses in employment and income. *See*, *e.g.*, Council for the District of Columbia, Public Roundtable Regarding Tenant Protection and Eviction Prevention, Sept. 14, 2020 (statement of Jennifer L. Berger), at 2, *available at* https://oag.dc.gov/sites/default/files/2020-09/OAG-Testimony-COVID-Tenant-Protection-Eviction-Prevention.pdf; [6-3] at 95, CDC Moratorium, 85 Fed. Reg. at 55,293 n.5, 55,295. An August 2020 study using recent Census survey data "estimate[s] that approximately one-third of District families—between 51,000 to 57,000 households, or 118,000 to 131,000 individuals—are at risk of eviction because of the pandemic." SUMF ¶ 19. Any displacement, and especially such a large displacement, of residents would likely increase the spread of COVID-19 in the District, because many of those displaced would turn to shared housing. *Id.* ¶ 22.

These overlapping consequences—and the dangers of COVID-19—disproportionately affect communities of color, and thus also promise to deepen inequities along racial lines. SUMF ¶ 23.

7

III.   **The District's Response**

On March 17, 2020, less than a week after the Mayor first declared a public health emergency, the Council enacted, and the Mayor signed into law, a moratorium on evictions in the District. COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, § 308 (Mar. 17, 2020) (March 17 Emergency Act). Section 308 of the March 17 Emergency Act, titled "Eviction prohibition," prohibits evictions during the public health emergency, except in certain cases where a court has found that the tenant performs an illegal act, abandons the premises or causes undue hardship to other tenants or neighbors. *See* D.C. Code §§ 42-3505.01(k)(3) (the Eviction Moratorium), (k-1) (exceptions). Section 308 also amended D.C. Code § 16-1502, which governs service of summonses in actions under § 16-1501; as amended, service must be made at least seven days before "trial," excluding Sundays, holidays and days when the Mayor has declared a public health emergency (the Summons Delay). Section 308 was part of an extensive attempt to meet the extraordinary needs of the moment. *See generally* March 17 Emergency Act.

When enacting the March 17 Emergency Act, the Council cited the risk COVID-19 posed to a "large number of people," and emphasized that it "threaten[ed] to overburden the health care system in the District of Columbia." *See* D.C. Res. 23-382, preamble, § 2(a) (Mar. 17, 2020). The Council further declared that "District tenants who are impacted by decreased work hours or temporary layoffs … may have their earnings greatly reduced, making it imperative to prohibit utility shutoffs or evictions during this public health emergency." *Id.* § 2(k).

On May 5, 2020, the Council expanded the list of prohibitions. D.C. Act 23-317, § 10 (effective May 13, 2020). Section 10, titled "Eviction clarification," amended D.C. Code § 16-1501 to prohibit the filing of "a complaint seeking relief" during a declared public health emergency "and for 60 days thereafter." *Id.* (the Filing Moratorium). Days later, on May 19, 2020, the Council replaced its prior measures with a consolidated version. D.C. Act 23-326, § 1201 (May 27, 2020) (May 27 Emergency Act). The May 27 Emergency Act reenacted, verbatim, all prior prohibitions. *Id.* § 404.

Because emergency legislation is only effective for 90 days, the Council reenacted the May 27 Emergency Act twice.[2] *See* D.C. Act 23-328, § 404 (June 8, 2020); D.C. Act 23-405, § 404 (Aug. 19, 2020). The Council also enacted temporary legislation, with the same provisions, which will remain in effect until May 22, 2021.[3] D.C. Law 23-130, §§ 404, 1204 (approved July 7, 2020, effective Oct. 9, 2020).

Finally, in September 2020, the Council added to its existing regulation by prohibiting issuance of notices to tenants to vacate. Eviction Notice Moratorium Emergency Amendment Act of 2020, D.C. Act 23-415, § 2 (signed Oct. 14, 2020), *codified at* D.C. Code § 42-3505.01(q) (the Notice Moratorium). The Council explained that the existing moratoria on execution and filing were not enough because renters

---

[2]    Emergency legislation is effective immediately upon signature of the Mayor and is effective for a maximum of ninety days. *United States v. Alston*, 580 A.2d 587, 590 (D.C. 1990); D.C. Code § 1-204.12(a).

[3]    Temporary legislation—if not disapproved by Congress—is valid for no more than 225 days. *See Zukerberg v. District of Columbia Bd. of Elections & Ethics*, 97 A.3d 1064, 1069 n.39 (D.C. 2014); *Alston*, 580 A.2d at 590-91.

were still receiving notices to vacate and because residents were moving out
preemptively, a practice known as "self-evicting," as a result of "fear, negative court
experiences in the past, confusion, immigration status, or language barriers." D.C.
Res. 23-519, § 2. The Council prohibited issuance of notices to vacate to "avoi[d] these
unnecessary moves, which the Council has already taken action in previous
legislation to try to avoid," to "reduce doubling up and exposure to the coronavirus,"
and to "improve equity of the eviction moratorium for immigrant renters." *Id.*

## IV.   Plaintiff's Claims

Plaintiff is the owner of residential property located in the District. SUMF ¶
24. In January 2019, plaintiff executed a lease of that property (the Lease), with a
tenant who remains unnamed in this action. *Id.* ¶ 25. Plaintiff alleges that his tenant
has violated the Lease by damaging and subletting the property. Am. Compl. [5] ¶¶
20-42; Neff Decl. [6-2] ¶ 2 (declaring that "[e]ach of the factual allegations asserted
in the Complaint are true and correct"). Plaintiff asserts he has been issued notices
of housing code violations and fines totaling $7,329.00 from the D.C. Department of
Consumer and Regulatory Affairs (DCRA) because of the damage purportedly done
to the property by his tenant. Am. Compl. ¶ 34. More than $4,000 is "for a missing
smoke detector in the unit and in the common area hallway." *Id.* ¶ 35.

Plaintiff filed this suit on November 18, 2020, along with a motion for a
temporary restraining order (TRO). Compl. [1]; Pl.'s Mot. for TRO and for an
Emergency Hr'g, and Mem. in Support of Mot. for TRO [2]. With the consent of the
Parties, the Court converted the motion to one for summary judgment and scheduled

briefing on cross-motions. *See* Minute Order of Dec. 17, 2020. *See also* Minute Order of Dec. 29, 2020. On January 15, 2021, plaintiff filed his Amended Complaint and a motion for preliminary injunction (PI) and summary judgment [6] (Motion). *See* also Mem. in Support of Pl.'s Motion (Pl.'s Mem.) [6-1]. Plaintiff did not file a statement of material facts with his motion for summary judgment.[4]

Plaintiff challenges four provisions of District law as unconstitutional:  D.C. Code §§ 16-1501(b) (the Filing Moratorium), 16-1502 (the Summons Delay), 42-3505.01(k)(3) (the Eviction Moratorium) and 42-3505.01(q) (the Notice Moratorium) (collectively, the Moratorium). Am. Compl. at 16 (prayer for relief). He claims that continued occupation by his tenant will irreparably harm him, *id.* ¶ 42, and that the Moratorium violates his right to access courts (Count I), as well as the Contracts and Takings Clauses of the Constitution (Counts II and III), because it prevents him "from evicting [his] Tenant," *id.* ¶¶ 47-48. Plaintiff asks the Court to declare each provision of the Moratorium unconstitutional, and for a judgment "enjoining Defendants … from enforcing" the Moratorium and "[p]ermitting Plaintiff to serve an eviction notice upon Tenant, commence an action to evict … , litigate the action to evict, and, if successful, evict Tenant from the Property." *Id.* at 16. He seeks damages "as a result of the unconstitutional taking," *id.* at 1, "commensurate with all damage caused by Tenant to the Property after [the challenged laws] were implemented, in an amount

---

[4]    Local Civil Rule 7(h) requires all motions for summary judgment to be accompanied by a statement of material facts. "This deficiency alone could warrant a denial of [p]laintiff's Motion." *Butt v. United States Department of Justice*, 2020 WL 4436434, *3 (D.D.C. Aug. 30, 2020).

to be determined, inclusive of all costs to repair the Property, and all fines imposed by the DCRA," *id.* at 16.

## LEGAL STANDARD

### I.   Federal Rule of Civil Procedure 12(b)(6)

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 6 (D.D.C. 2019) (internal quotation marks omitted). The Court may consider the facts alleged in the complaint, documents attached to or incorporated in the Complaint and matters of which it may take judicial notice. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017).

### II.   Federal Rule of Civil Procedure 56

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### III.   Preliminary Injunction

A PI "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22

(2008)). Preliminary relief is meant "to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation marks omitted). Plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (emphasis added). It is plaintiff's burden to prove all four prongs before relief can issue. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009); *id.* at 1296 (Kavanaugh, J., concurring); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir 2013).

## ARGUMENT

## I.   Plaintiff's Claims for Prospective Relief Are Not Justiciable.

### A.   Plaintiff Lacks Standing To Seek Prospective Relief.

Plaintiff alleges that the Moratorium violates his constitutional rights by preventing him from evicting his tenant. Am. Compl. ¶¶ 43-48. But it is unclear whether the Moratorium prevents that, or whether plaintiff could in fact evict his tenant in the absence of the Moratorium. "A plaintiff must demonstrate standing separately for each form of relief sought … ." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000). Plaintiff must satisfy three requirements:  injury in fact, causation and redressability. *Delta Air Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 250, 260 (D.D.C. 2015). Here, plaintiff lacks standing to seek declaratory or injunctive relief, because he cannot show that injury caused by the Eviction Moratorium is certainly impending or that the relief requested

concerning any Moratorium provision would likely redress his alleged injury.

### 1. Plaintiff's Alleged Injury Is Not Certainly Impending.

"An injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Kan. Corp. Comm'n v. Fed. Energy Regulatory Comm'n*, 881 F.3d 924, 929 (D.C. Cir. 2018) (internal quotation marks and citation omitted). To satisfy the imminence requirement, an injury must be "*certainly impending*"; "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted) (emphasis in original).

Here, any injury is not certainly impending because the Eviction Moratorium may not apply at all to plaintiff's case. The provision of District law plaintiff challenges prohibits all evictions during a public health emergency. D.C. Code § 42-3505.01(k)(3). But the next subsection, (k-1), provides that subsection (k) "shall not apply:

> (1) Where … a court of competent jurisdiction has determined that the tenant has performed an illegal act within the rental unit … ; (2) Where a court of competent jurisdiction has made a specific finding that the tenant's actions or presence causes undue hardship on the health, welfare, and safety of other tenants or immediate neighbors; or (3) Where a court of competent jurisdiction has made a specific finding that the tenant has abandoned the premises.

D.C. Code § 42-3505.01(k-1). Subsection (k-1) has yet to be applied in an eviction action. *See* Super. Ct. Dec. 16 Order at 38. Its application to *any* eviction action, including plaintiff's, is therefore uncertain. But plaintiff's allegations concerning his anticipated grounds for eviction appear to fit within one of the exceptions enumerated

in subsection (k-1). *Compare* Am. Compl. ¶¶ 38, 42 (alleging hardship and risk to other tenants as a result of plaintiff's tenant's occupation) *with* D.C. Code § 42-3505.01(k-1)(2) (permitting eviction on finding of hardship to others).

Accordingly, it cannot be said that plaintiff faces any "certainly impending" injury as a result of the Eviction Moratorium, or that the Eviction Moratorium in fact prevents him from obtaining the relief he seeks (that is, eviction of his tenant). Plaintiff therefore lacks standing to seek prospective relief with respect to the Eviction Moratorium. *Clapper*, 568 U.S. at 409.

### 2.   Plaintiff's Alleged Injury Is Not Redressable by This Court.

Plaintiff wants to evict his tenant, Am. Compl. ¶¶ 46-48, but as he admits, Pl.'s Mem. at 34, this Court cannot evict plaintiff's tenant—only the Superior Court can do that, after the appropriate proceedings have occurred. For plaintiff to have standing, "it must be likely, as opposed to merely speculative, that" his alleged "injury will be redressed by a favorable decision." *Lujan v Defenders of Wildlife*, 504 U.S. 555, 571 (1992). To find standing here, therefore, this Court would also need to find it *likely* that the relief plaintiff requests would redress his injury—that is, that plaintiff's eviction suit would succeed. *Id.* Plaintiff is therefore also implicitly asking this Court to evaluate the facts of his eviction claim under District law, in the absence of any presentation from his tenant, and to anticipate the ruling of a Superior Court judge. But the outcome of such action by plaintiff in Superior Court is unclear.

Plaintiff alleges that his tenant "would have no defenses to an eviction action." Am. Compl. ¶ 56. But, on summary judgment, the Court does not take plaintiff's

allegations as true; and, in any event, this assertion is a legal conclusion entitled to no weight. *See, e.g.*, *Pueschel v. Chao*, 955 F.3d 163, 166 (D.C. Cir. 2020) ("[T]he court is not required to accept legal conclusions as correct."). Indeed, plaintiff's tenant may not, in fact, have committed the lease violations plaintiff alleges. Even so, District law requires that landlords serve tenants with notice of any alleged lease violations and provide them with an opportunity to cure. *See* D.C. Code § 42-3505.01(b) (requiring notice and opportunity to cure); 14 D.C.M.R. § 4301 ("notice must specify what actions need to be taken by the tenant to avoid an eviction" and can refer only to violations within six months prior to the notice). If there is a new violation after plaintiff has cured a prior violation, a landlord must provide another notice and opportunity to cure. *E.g.*, *Borger Management, Inc. v. Nelson-Lee*, 959 A.2d 694 (D.C. 2008). And even if the violations are established, the Superior Court may consider whether the established violations warrant forfeiture of the lease. *See Entrepreneur, Ltd. v. Yasuna*, 498 A.2d 1151, 1160-64 (D.C. 1985) (holding lease violations did not warrant forfeiture, and outlining factors for consideration including parties' good or bad faith, prejudice to the landlord and alternatives to make the landlord whole, the nature of the breach and whether it was willful or deliberate).

Plaintiff alleges his tenant caulked and otherwise "caused damage to" hardwood floors in the property, "failed to keep at least 80% of the floor covered with rugs or carpeting," failed to timely notify him of a leak, is noisy, is hoarding belongings, "gave her keys to an adult who is not on the Lease," covered a heating vent and removed smoke detectors. Am. Compl. ¶¶ 24-26, 29, 31, 33, 35. Plaintiff does

16

not say when he first learned of each violation, or whether he has given his tenant any notices of the alleged violations or opportunities to cure. It is therefore unclear which of these alleged violations, if any, might serve as grounds for eviction. It is also unclear whether, even if established, the violations warrant forfeiture.[5]

This many-linked chain of what-ifs, dependent upon the decisions of third parties, is insufficient to establish redressability. *See*, *e.g.*, *Lujan*, 504 U.S. at 571 (plaintiffs lacked standing when "redress of the only injury in fact respondents complain of requires action" by third parties, and "any relief the District Court could have provided in this suit against the Secretary was not likely to produce that action"); *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 45, 50 (D.C. Cir. 2016) (dismissing claims for lack of standing, because requested vacatur of federal guidance which permitted certain billboards would not ensure plaintiffs' ability to secure an order removing billboards); *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017). Accordingly, plaintiff lacks standing to seek prospective relief with respect to any provision of the Moratorium because his alleged injury is not likely to be redressed by a ruling from this Court.

---

[5]     According to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), Hoarding Disorder is a mental health condition. *See, e.g.*, Darrel A. Reiger, *et al.*, The DSM-5: Classification and Criteria Changes, 12(2) World Psychiatry 92 (2013), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3683251/ (last accessed Feb. 4, 2021). Under District law, if plaintiff's tenant has such a disorder, or others, she may also be entitled to disability accommodations. *See Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109 (2005) (reversing verdict for landlord when tenant provided prima facie evidence to support defense that she should have been afforded a reasonable accommodation before eviction, including extended opportunity to clean apartment).

**B.** **The Court Should Abstain from Deciding the Constitutional Challenge to § 42-3505.01(k)(3) Because It May Be Avoided Under State Law.**

Even if plaintiff has standing, this Court should abstain from exercising jurisdiction over plaintiff's challenge to D.C. Code § 42-3505.01(k) (the Eviction Moratorium), under the *Pullman* abstention doctrine, because plaintiff's constitutional questions may be avoided by a decision on uncertain District law. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). "[T]he purpose of *Pullman* abstention … is to avoid resolving the federal question by encouraging a state-law determination that may moot the federal controversy." *San Remo Hotel, L.P. v. City & Cnty. of San Francisco, Cal.*, 545 U.S. 323, 349 (2005). Consequently, "[w]here resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 511 (1972) (quoting *Harman v. Forssenius*, 380 U.S. 528, 534 (1965)).

Here, plaintiff's constitutional challenges to the Eviction Moratorium could be mooted by a finding in Superior Court that plaintiff's grounds for eviction fit into an exception to the Moratorium under District law. As discussed above, plaintiff's case may well fit into an exception to the Eviction Moratorium. *See* Argument Section I.A.1. In order to avoid unnecessarily deciding plaintiff's three constitutional challenges to the Eviction Moratorium, this Court should thus decline to exercise jurisdiction over these claims and permit the Superior Court to decide in the first

instance whether the Moratorium even applies to plaintiff's case. *E.g.*, *Lake Carriers' Ass'n*, 406 U.S. at 512 (affirming abstention where resolution of state law question was "sufficiently likely to avoid or significantly modify the federal questions"). Abstention is all the more appropriate here, because plaintiff readily acknowledges he will have to litigate the question of District law in Superior Court either way. *See* Pl.'s Mem. at 34.

## II.   Plaintiff's Claims Fail on the Merits.

### A.   Plaintiff Has Not Been Denied Access to Courts Because the Right of Access Does Not Dictate Underlying District Law.

Plaintiff contends that the Moratorium violates his right to access courts. Pl.'s Mem. at 14-18. Plaintiff is incorrect. As plaintiff acknowledges, the right to access courts depends on the existence of an "underlying claim, without which a plaintiff cannot have suffered injury by being shut out of the court." Pl.'s Mem. at 15 (quoting *Christopher v. Harbury*, 536 U.S. 403, 413 (2002)). When, as here, legislation alters the underlying claim, it does not thereby violate the right to access courts. Plaintiff's contrary position puts the cart before the horse. *Cf. Pernell v. Southall Realty*, 416 U.S. 363, 383 (1974) (right to jury trial in eviction actions under D.C. Code § 16-1501 does not prevent legislature from moving those actions exclusively to administrative tribunals, where jury is not available).

The First Amendment prohibits the government from passing any law abridging the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. The Supreme Court has recognized "that the right of access to the courts" falls within this protection, among others. *Bill Johnson's Restaurants, Inc. v.*

*NLRB*, 461 U.S. 731, 741 (1983); *Christopher*, 536 U.S. at 415 n.12. But any ability to sue is predicated on the existence of a cause of action, without which no right to sue exists. *See, e.g.*, *Christopher*, 536 U.S. at 415, 418 (affirming dismissal of right-to-access claim where plaintiff failed to identify an underlying cause of action). That is, the right to access courts is "ancillary to the underlying claim." *Id.* The right to access courts therefore does not preclude legislatures from altering substantive causes of action that may be heard in those courts. *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008) ("The right to petition exists in the presence of an underlying cause of action and is not violated by a statute that provides a complete defense to a cause of action or curtails a category of causes of action.").

Courts have consistently upheld the rights of legislatures to create, alter or eliminate causes of action, even on a permanent basis, against similar challenges. *See, e.g.*, *Doherty v. Merck & Co., Inc.*, 892 F.3d 493, 499 (1st Cir. 2018) (rejecting access-to-courts challenge of Maine statute prohibiting damages actions stemming from birth of healthy child); *Beretta*, 524 F.3d at 398 (upholding act abolishing cause of action against right-to-access challenge); *Wyeth-Ayerst Laboratories*, 385 F.3d 961, 967-68 (6th Cir. 2004) (same). The Moratorium is no different.

In December 2020, the Superior Court held that the Filing Moratorium is unconstitutional because it violates property owners' "right to go to court to regain possession of their property in a summary proceeding." Super. Ct. Dec. 16 Order at 1. The District, as an intervening party, has appealed the decision, and the judgment is presently subject to an administrative stay. *See District of Columbia v. Towers*, No.

21-CV-34 (D.C.), Order of Feb. 2, 2021. Although the Superior Court concluded that the Filing Moratorium unconstitutionally abridged that right, the opinion cited no authority identifying such a right within the Constitution or District law, nor did it cite any authority establishing that right as somehow part and parcel of the right to access courts. *See generally* Super. Ct. Dec. 16 Order; *cf. Rubinovitz v. Rogato*, 60 F.3d 906, 910–11 (1st Cir. 1995) (holding there is no fundamental "right to evict" in the U.S. Constitution); *Inmates of Suffolk Cnty Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997) ("[W]hile there is a constitutional right to court access, there is no complementary constitutional right to receive or be eligible for a particular form of relief."). *But cf. Baptiste v. Kennealy*, Civil Action No. 20-11335, 2020 WL 5751572, at *27 (D. Mass. Sept. 25, 2020) (reasoning temporary eviction moratorium affects the "right to go to court to evict" but upholding it under rational basis review). As discussed, the right to access courts does not indirectly secure a right to bring any particular cause of action; to the contrary, the right depends fully on a pre-existing cause of action.[6] *Christopher*, 536 U.S. at 415. The Moratorium does not violate plaintiff's right to access courts.

---

[6]     The Superior Court also applied intermediate scrutiny to property owners' right to access courts claim. Super. Ct. Dec. 16 Order at 11-19. However, because the Moratorium does not in fact infringe on plaintiff's right to access courts, this Court need not apply *any* level of scrutiny. *See, e.g., Beretta*, 524 F.3d at 398 (finding act did not violate right to access courts and ending consideration of claim without applying further scrutiny); *Garcia*, 385 F.3d at 967–68 (affirming denial of right-to-access claim on finding act did not infringe the right, without further scrutiny). Alternatively, if this Court were inclined to subject the Act to constitutional scrutiny, only rational basis review would be warranted because the Act does not implicate any "fundamental" interest. *See Washington v. Glucksberg*, 521 U.S. 702, 767 n.9 (1997) (Souter, J., concurring); *United States v. Kras*, 409 U.S. 434 (1973) (bankruptcy fee

**B.**     <u>The Moratorium Does Not Violate the Contracts Clause.</u>

The Moratorium similarly does not violate the Contracts Clause because it is a temporary limitation on the enforcement of one aspect of leases, reasonably related to the legitimate—indeed compelling—goals of saving lives, reducing the spread of COVID-19 and preventing the manifold harms of mass evictions.

The Contracts Clause provides that "[n]o state shall … pass any … law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10; *see also* D.C. Code § 1-203.02 (Council's power subject to Contracts Clause). However, "not all laws affecting pre-existing contracts violate the [Contracts] Clause." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018); *see also*, *e.g.*, *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 502 (1987). The Clause applies only when the challenged act "operate[s] as a substantial impairment of a contractual relationship." *Sveen*, 138 S. Ct. at 1821-22. In answering that threshold question, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from reinstating his rights." *Id.* Even if a law substantially impairs a contract, it is nonetheless constitutional so long as it is "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id.* (internal quotation marks omitted).

---

does not violate due process or equal protection because there is no fundamental right to discharge in bankruptcy, distinguishing *Boddie*); *Ortwein v. Schwab*, 410 U.S. 656 (1973) (same, considering filing fee for petition to review denial of welfare benefits). In any event, the Moratorium satisfies intermediate scrutiny for the reasons explained in Section II.B.2 below.

1.    **The Act Does Not Substantially Impair Plaintiff's Lease.**

The Moratorium does not undermine plaintiff's contractual bargain, interfere with his reasonable expectations or prevent him from reinstating his rights. For nearly a century, the possibility of emergency state action has been an implied part of every landlord's contractual bargain with tenants. *See, e.g., Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 198 (1921) ("[C]ontracts are made subject to this exercise of the power of the State when otherwise justified, as we have held this [limited eviction moratorium] to be."); *see also Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 438-40 (1934) ("Not only are existing laws read into contracts … , but the reservation of essential attributes of sovereign power is also read … [in].").

Indeed, the Supreme Court first upheld a temporary limitation on the enforcement of evictions in the District almost exactly a century ago. *Block v. Hirsh*, 256 U.S. 135, 158 (1921). During World War I, a "grave social problem" arose from a housing shortage that followed the wartime lapse in building. *Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242, 245–46 (1922). Congress responded by enacting emergency legislation (the WWI Legislation), valid for two years, that permitted District tenants to occupy rental properties beyond the terms of their lease so long as they paid the rent and performed lease obligations as set by the lease, or as modified by a new commission created by the act. *Block*, 256 U.S. at 153–54; *see also* The Food Control and the District of Columbia Rents Act, P.L. 66-93 § 106, 41 Stat. 298, 300 (1919) (declaring that District rental properties "are affected with a public interest" and that "all terms and conditions of the use or occupancy thereof, shall be fair and

reasonable"), attached as Ex. O. The WWI Legislation also "suspended" the "ordinary remedy" for lease violation of "trial by jury on the right to possession of the land," assigning disputes to the new commission instead. *Block*, 256 U.S. at 158; 41 Stat. at 300 (commission determines "fair and reasonable" terms). In upholding the measure, the Supreme Court concluded that the WWI Legislation was within the government" police powers and reasonably related to legitimate goals. *Block*, 256 U.S. at 156-58.

Since then, the Supreme Court has repeatedly upheld similar—and much more expansive—laws designed to control rents and to regulate the landlord-tenant relationship generally, including terms for the right to possession and the manner of its enforcement. *See Edgar*, 258 U.S. at 247, 250 (upholding New York rent control and eviction restriction law similar to WWI Legislation, against Contracts Clause and due process challenges); *Marcus Brown*, 256 U.S. at 198-99 (same); *Bowles v. Willingham*, 321 U.S. 503, 505–21 (1944) (upholding Emergency Price Control Act of 1942 (EPCA), which created federal administration to set rents and hear disputes, against challenges under the non-delegation doctrine, the Takings Clause and due process); *Lockerty v. Phillips*, 319 U.S. 182, 184-86 (1943) (upholding withdrawal of federal district court jurisdiction to hear disputes under EPCA); *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 139-46 (1948) (upholding act of 1947, which extended EPCA, against challenge that Congress lacked power to extend controls beyond the end of the war or to delegate such power to an agency, and that the act violated equal protection and effected a taking); *Fisher v. City of Berkeley*, 475 U.S. 260 (1986) (rent ceilings do not violate the Sherman Act); *Pennel v. City of San Jose*, 485 U.S. 1, (1988)

(law authorizing local agency to set rents, and requiring consideration of "tenant hardship," does not violate due process or equal protection, nor constitute a taking); *Yee v. City of Escondido*, 503 U.S. 519 (1992) (law limiting landlords' rent and ability to evict does not constitute a physical taking).

District law has significantly, specifically and continuously regulated the right to possession as between landlords and tenants for nearly fifty years. *E.g.*, *Suggs*, 933 A.2d at 797–98 (discussing changes by predecessor to § 42-3505.01, first enacted in 1974); *Redman v. Potomac Place*, 972 A.2d 316, 320 n.5 (D.C. 2009) ("The District's rent control legislation imposes significant limitations on a landlord's ability to evict a tenant.").[7] When plaintiff entered into his Lease, District law regulated in great detail plaintiff's right to regain possession and limited his ability to evict his tenant. *See, e.g.*, District of Columbia Office of The Tenant Advocate, District of Columbia Tenant Bill of Rights (July 3, 2015), attached as Ex. P. Plaintiff could not, for example, evict his tenant amid rain or freezing temperatures. *See* D.C. Code § 42-3505.01(k)(1), (2). He could only regain possession by meeting one of the substantive criteria set forth in section 42-3505.01. *Redman*, 972 A.2d at 320 n.5 ("The landlord

---

[7]     District and federal law, as discussed above, also intermittently regulated rent and evictions for decades before that. *See* Wade Wetherington, *The District of Columbia Rental Housing Act of 1977: The Effect of Rent Control on the Rental Housing Market*, 27 Cath. U. L. Rev. 607, 607–08 (1978) (discussing waves of rental housing regulation in response to World War I, World War II and inflation in the 1970s); S.R. Rep. No. 93-384, at 19 (1978) (describing rent and eviction control regulations in effect in the District from 1918–1925 and 1941–1953). Maintenance requirements are also extensively regulated. *See, e.g.*, *Javins v. First Nat. Realty Corp.*, 428 F.2d 1071, 1080 (D.C. Cir. 1970) (explaining that "75 pages" of housing code regulations "provide a comprehensive regulatory scheme" setting forth standards, burdens, and a variety of mechanisms for enforcement).

must state a statutorily sufficient reason to proceed with eviction."); *Habib v. Thurston*, 517 A.2d 1, 5 n.3 (D.C. 1985) (noting District protections "creat[e] … tenancies … terminable only on the occurrence of an event specified by statute … .").

In light of the District's long history of rental housing and eviction regulation, and its well-established authority to regulate the rental housing relationship to meet the needs of the public interest, particularly in times of emergency, the Moratorium does not undermine plaintiff's contractual bargain, or interfere with his reasonable expectations, because the possibility of such regulation was foreseeable and, indeed, an implied part of plaintiff's bargain. *See Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 416 (1983) (utility's expectations were not impaired by price regulations because "[p]rice regulation existed and was foreseeable as the type of law that would alter contract obligations"); *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38 (1940) (upholding permanent acts that prevented suits to recover the withdrawal value of shares in loan association, in light of industry regulations stretching back 40 years, and reasoning that "[w]hen [plaintiff] purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic").

Further, and contrary to plaintiff's argument, the Moratorium has not voided any contractual obligations, and it does not prevent plaintiff (or landlords generally) from ultimately enforcing their rights. The Moratorium does not "render lease agreements unenforceable." *See* Pl.'s Mem. at 19. Plaintiff asserts that his tenant has damaged the property, but the Lease accounts for this risk and specifically provides

for remedies other than eviction. The Lease requires a security deposit, which plaintiff may elect to keep as compensation for any damage done to the property. SUMF ¶ 27. It requires plaintiff's tenant to indemnify him for damage done. *Id.* ¶ 29. It even shifts responsibility to the tenant for any fines imposed as a result of a tenant's tampering with smoke detectors. *Id.* ¶ 28. The Moratorium does not invalidate the Lease or affect in any way all of these other, more specific and bargained-for remedies. Plaintiff could thus presently enforce his Lease by, for example, seeking damages for the breaches alleged in an action for breach of contract or other civil actions. He does not need to evict his tenant to obtain compensation—indeed, he *could not* obtain the compensation he desires in an action for eviction under § 16-1501. *See* Super. Ct. Landlord and Tenant Rule 3(b) (specifying that only claims for possession of real property, personal property and "rent in arrears and late fees" are permissible in a Landlord and Tenant action). Moreover, there is no *permanent* prohibition on filing or prosecution of eviction actions; the Moratorium limits landlords' ability to sue for possession only during the COVID-19 public health emergency and for 60 days thereafter. D.C. Code § 42-3505.01(k), (q). The Moratorium does not void tenants' obligations to pay rent and maintain the property, nor does it eliminate a landlord's ability to sue for possession after the Moratorium expires. *Id.*

For all of these reasons, the Moratorium does not substantially impair plaintiff's contract, because it does not "undermin[e] his contractual bargain, interfer[e] with [his] reasonable expectations, or preven[t him] from reinstating his rights." *Sveen*, 138 S. Ct. at 1822 and n.3 (reasoning that the Court "has always

approved statutes like this one, which enable a party with only minimal effort to protect his original contract rights"); *see also Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 172 (S.D.N.Y. 2020) (finding state eviction moratorium did not substantially impair contract rights because it does not "eliminate" remedies, "it merely postpones the date on which landlords may commence summary proceedings against their tenants"), *appeal filed*, No. 20-2565 (2d Cir. July 28, 2020); *Auracle Homes, LLC v. Lamont*, Civil Action No. 20-00829, 2020 WL 4558682, at *17 (D. Conn. Aug. 7, 2020) (same, with respect to Connecticut state moratorium); *HAPCO v. City of Philadelphia*, Civil Action No. 20-3300, 2020 WL 5095496, at *8 (E.D. Pa. Aug. 28, 2020) (same, with respect to Philadelphia city moratorium).[8]

### 2. The Act Reasonably Advances a Compelling Public Interest.

Even if this Court were to find that the Moratorium impairs plaintiff's contract, it is still constitutional because it is "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *See Sveen*, 138 S. Ct. at 1822.

As discussed above, the Supreme Court upheld a temporary prohibition on actions for possession in the District on public health grounds almost a century ago.

---

[8]    And, if the Court finds the Moratorium can be constitutionally applied to plaintiff's facts, then the Moratorium survives both plaintiff's as-applied and facial challenges. *See In re Sealed Case*, 936 F.3d 582, 588–89 (D.C. Cir. 2019) ("To succeed on a facial challenge, a defendant must generally establish that no set of circumstances exists under which the [law] would be valid, *i.e.*, that the law is unconstitutional in all of its applications.") (internal quotation marks omitted); *id.* at 597 (Henderson, J., concurring) ("Plainly, there are constitutional applications of the statute. That is why we reject Appellant's facial constitutional challenge."); *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 160–61 (D.D.C. 2015) (explaining that a facial challenge to a criminal statute failed because there was "at least one class of cases … in which" it "may be constitutionally applied").

28

*Block*, 256 U.S. at 154, 156–58 ("Congress has stated the … danger to the public health in the existing condition of things. … Housing is a necessary [*sic*] of life. All the elements of public interest … are present."). And it has upheld sweeping regulations of rental housing repeatedly since then, repeatedly finding that such regulations are in the public interest. *See* Argument Section II.B.1; *Pennell v. City of San Jose*, 485 U.S. 1, 12 (1988) (recognizing that "alleviating individual tenant hardship" is a "legitimate and rational goal" of policymakers). The Supreme Court has also squarely held that the public has an interest in preventing the spread of disease. *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905) (upholding mandatory vaccination as a legitimate interest within the state's police power). Against these precedents, plaintiff's argument that the Moratorium is not a "legitimate" exercise of its police power is unavailing. *See* Pl.'s Mem. at 20-21.

Indeed, the District's interest here is compelling. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest … ."). Housing instability during the pandemic is literally a matter of life and death for evicted tenants and the affected communities into which they would disperse. *See* Background, Section II, above; *cf. Brown v. Azar*, Civil Action No. 20-3702, 2020 WL 6364310, at *11-*13 (N.D. Ga. Oct. 29, 2020) (denying request to enjoin CDC Moratorium and finding substantial evidence that a temporary eviction moratorium is "reasonably necessary" to prevent the spread of COVID-19), *appeal filed*, No. 10-14210 (11th Cir. Nov. 9, 2020). This is true regardless of the reason any particular landlord might have for seeking to evict

29

any particular tenant. *Id.* The District therefore has a compelling interest in preventing evictions of all kinds. 141 S. Ct. at 67.

Further, the Council determined that a prohibition on the execution of evictions alone is not enough to ensure tenants are not relocating during the pandemic. In the Fall of 2020, the Council found that, despite then-existing moratoria on the execution and filing of eviction actions, tenants who simply received notices to vacate were self-evicting, thus increasing the risk of COVID-19 throughout the District. *See* D.C. Res. 23-519. In an effort to curb self-evictions, the Council prohibited the issuance of notices to vacate during the public health emergency and for 60 days thereafter. D.C. Act 23-415. The same logic applies to the Council's temporary prohibition on filing actions for eviction.

The social and economic consequences of individual and mass evictions are also indisputably significant and legitimate public policy concerns. *See, e.g.*, *Blaisdell*, 290 U.S. at 438–40 (upholding foreclosure moratorium, reasoning that "state power exists to give temporary relief from the enforcement of contracts" and is legitimately exercised even when the need "is produced by … economic causes" rather than health or safety concerns). Even after the end of the public health emergency, these concerns justify the brief, 60-day extension of the Filing and Notice moratoria, to permit tenants some time in which to regain full employment once businesses are permitted to re-open and get their finances in order. *Id.*; *Woods*, 333 U.S. at 141 (Congress could extend wartime rent controls beyond the cessation of hostilities to address the lingering "evils" created by the emergency).

30

Plaintiff suggests that the measures chosen must be "tailored to the emergency that it was designed to meet." Pl.'s Mem. at 24 (quoting *Allied Structural Steel Co. v. Spannus*, 438 U.S. 234, 242 (1978)). And he offers an array of possible policy alternatives to the Moratorium. *Id.* at 25-27. But these are choices for the elected branches, not grounds for court-imposed relief. And, to be sure, the Contracts Clause does not require narrow tailoring—to the contrary, the Council is owed significant deference in its choice of methods to meet legitimate public policy goals. *See, e.g.*, *Keystone*, 480 U.S. at 506 ("refus[ing] to second-guess" Pennsylvania's "determinations that these are the most appropriate ways of dealing with the problem"); *id.* at 505 ("[C]ourts should 'properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'") (quoting *Energy Reserves Grp.*, 459 U.S. at 413); *Block*, 256 U.S. at 158; *Antoni v. Greenhow*, 107 U.S. 769, 775 (1883) (denying Contracts Clause claim and reasoning that courts "ought never to overrule the decision of the legislative department ... unless a palpable error has been committed"). The choice of policy options plaintiff now offers the Court is precisely the choice reserved for the Council and the Mayor, *id.*, and which they have made in favor of the Moratorium. *See also Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty.") (citing cases); *Jacobson*, 197 U.S. at 27.

Even so, the Moratorium is tailored to "the emergency that it was designed to meet." As discussed above, according to the CDC, COVID-19 is very easily spread

31

among persons in close contact; until there is a widely available vaccine or treatment, the best way to prevent its spread and to save lives is to enable individuals to maintain distance from others and to completely isolate as needed. Background, Section II. Evictions threaten lives by forcing evicted tenants into shared spaces or onto the streets. *Id.* And even issuance of a notice to vacate, or the filing of a legal action, results in tenants self-evicting and increases the likelihood of COVID spread. *Id.* The Moratorium therefore temporarily halts even the earliest stages of eviction proceedings.

The differences between the Moratorium and those considered in *Block*, *Blaisdell* and the other cases plaintiff cites, *see* Pl.'s Mem. at 21-25, are inapt, because the differences in policy reflect the differing nature of the emergencies they were designed to meet. None of the cases plaintiff cites, for example, involve regulations designed to permit everyone to shelter in place, with adequate distance from others, as needed, during a pandemic. *Id.* And, contrary to plaintiff's argument that the Contracts Clause requires protection of his "right to a reasonable return," Pl.'s Mem. at 21, the Clause does not "impose any specific limitations on legislatures' powers vis-à-vis contracts." *Apartment Assoc. of Los Angeles*, 2020 WL 6700568, at *5-*6 (rejecting argument that no law "may excuse tenants from paying a reasonable amount of rent contemporaneous with occupancy as a condition of avoiding eviction"). Instead it requires (as plaintiff also insists, Pl.'s Mem. at 24) case-by-case consideration. *Id.*

For all of these reasons, the Moratorium does not violate the Contracts Clause.

C.     **The Takings Clause Does Not Entitle Plaintiff to Relief.**

      1.     **The Act Does Not Effect a Physical Taking Because Plaintiff Invited His Tenant To Occupy His Property.**

The Supreme Court has repeatedly held that regulation of the right to possession as between landlords and tenants does not effect a *per se* taking. *Yee*, 503 U.S. at 527-28; *Bowles*, 321 U.S. at 517–18 (rent control, although it imposes economic losses on one class not shared by others, does not effect a *per se* taking because owners chose to use properties "for purposes which bring them under the Act"). Plaintiff argues that the Moratorium constitutes a temporary physical taking "because it authorizes a temporary physical occupation of Plaintiff's property by a third party against Plaintiff's will." Pl.'s Mem. at 28. He attempts to distinguish *Yee v. City of Escondido*, Pl.'s Mem. at 29, but that decision forecloses plaintiff's claim.

In *Yee*, lessors argued that a city regulation limiting their ability to evict lessees constituted a physical taking because it forced them to host third parties beyond the terms of their initial invitation, that is, beyond their lease terms. 503 U.S. at 526-27. Specifically, the law forbid landowners from evicting mobile-home owners, whose homes sat upon the land, unless the mobile-home owners violated certain lease terms, or the landowners completed a lengthy process to convert the use of their land to some other purpose entirely. *Id.* at 523-24. The Supreme Court held that the law did not effect a taking because it did not force the landowners to host anyone on their land—the landowners had invited the mobile-home owners. *Id.* at 527-28. The law thus did not impose an invasion but only changed the terms of their agreement. *Id.*

at 528-29. The Court observed that it would be "a different case" if the law prevented eviction "in perpetuity." *Id.* at 528.

Recently, discussing *Yee*, the Supreme Court hypothesized that a law forcing a property owner to accept tenants who were *never* invited—government offices, or vending-machine companies, for example—would effect a physical taking. *Horne v. Dep't of Agriculture*, 576 U.S. 350, 365 (2015). But that is not the case here. This case is just like *Yee*: Plaintiff invited his tenant onto his property, and the Council has merely—and temporarily—adjusted the terms of their agreement. Plaintiff urges that this case is different because his "[t]enant has exceeded the scope" of his "invitation in light of her continual destruction of the property … ." Pl.'s Mem. at 21. *Yee*, however, provides no basis to distinguish cases on this ground—rather, it stands for the proposition that once an owner invites a tenant to occupy her land, subsequent regulation governing the terms of tenant removal do not effect a taking. *See* 503 U.S. at 528 ("On their face, the … laws at issue here merely regulate petitioners' *use* of their land by regulating the relationship between landlord and tenant.") (emphasis in original); *Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47-48 (2d Cir. 1996) ("[W]here a property owner offers property for rental housing the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking."); *Elmsford*, 2020 WL 3498456, at *7 ("The Supreme Court has ruled that a state does not commit a physical taking when it restricts circumstances in which tenants may be evicted."). The District is therefore entitled to judgment on Count III. *Yee*, 503 U.S. at 528; *Elmsford*,

2020 WL 3498456, at *7-8 (holding temporary eviction moratorium does not effect a physical taking, citing *Yee*).

### 2.    Prospective Relief Cannot Be Granted for a Taking.

Even if plaintiff could show he has suffered a taking, which he cannot, plaintiff would not be entitled to an order invalidating the Moratorium, or to injunctive relief. Plaintiff argues that an injunction is appropriate here because (1) "the harm caused by" the alleged "physical invasion … is intangible and difficult to quantify," and (2) an injunction is "a more workable and equitable solution than compensation" because plaintiff's request implicates "the interests of so many property owners." Pl.'s Mem. at 30. But just last year, the Supreme Court reaffirmed that "there is no basis to enjoin the government's action effecting a taking" so long as "an adequate provision for obtaining just compensation exists." *Knick v. Twp. of Scott, Pa*., 139 S. Ct. 2162, 2176 (2019); *see also id*. at 2179 ("Governments need not fear that our holding will lead federal courts to invalidate their regulations as unconstitutional. As long as just compensation remedies are available—as they have been for nearly 150 years— injunctive relief will be foreclosed."). District law contains such a provision. *See* D.C. Code § 16-1353 (providing mechanism for compensation by the District upon determination a taking has occurred). All of the cases plaintiff cites predate *Knick*. *See* Pl.'s Mem. at 30. Although plaintiff argues that compensation in his case may be "difficult to quantify," and, at scale, "more workable," he does not argue that such compensation is unavailable. Thus, under *Knick*, injunctive or declaratory relief for plaintiff's Takings Clause claim is foreclosed.

35

### 3.   Plaintiff Is Not Entitled to Consequential Damages.

Similarly, the damages plaintiff seeks are not cognizable harms under the Takings Clause. The Takings Clause prohibits a government from taking private property without providing just compensation to its owner. *Lingle v. Chevron, U.S.A., Inc.*, 544 U.S. 528, 536 (2005). Just compensation, as a general rule, is the market value of the property taken at the time of the taking and does not include "consequential damages" such as lost profits, good will or relocation costs. *See, e.g.*, *United States v. Petty Motor Co.*, 327 U.S. 372, 377-78 (1946); *Mamo v. District of Columbia*, 934 A.3d 376, 382 (D.C. 2007). In the case of temporary takings, "the proper measure of compensation is the rental that probably could have been obtained" during the time of the taking. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7 (1949). "Unless damage or inconvenience caused by a temporary taking affects the market rental value of the property subject to the *temporary* taking, it is irrelevant to the determination of just compensation." *Mountain Valley Pipeline, LLC v. 1.23 Acres of Land*, Civil Action No. 18-610, 2019 WL 8918915, at *9 (W.D. Va. July 12, 2019) (emphasis in original); *see also United States v. General Motors Corp.*, 323 U.S. 373, 383 (1945) (holding costs of moving and refitting space for temporary tenant are not cognizable damages for a taking, but may be factored into the calculation of market rental price for the temporary taking).

Here, plaintiff does not show, or even allege, any loss in the market rental value of his property. Instead, plaintiff asks for what are, at best, consequential damages in the form of costs to repair his property and of repayment for certain fines

owed to the District. Am. Compl. at 16 (Prayer for Relief, Sec. E).[9] His claim should be rejected.

III.  **Plaintiff Is Not Entitled to a Preliminary Injunction.**

    A.  **Plaintiff's Claims Are Not Likely To Succeed on the Merits.**

Plaintiff is also not entitled to a preliminary injunction because he has not met his burden to show the four factors set forth in *Winter. See Winter*, 555 U.S. at 20.

First, he has not shown a likelihood of success on the merits, which is "the first and most important factor" in the preliminary injunction analysis. *Aamer*, 742 F.3d at 1038. Where the moving party "can show no likelihood of success on the merits, then preliminary relief is obviously improper." *Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009). The Court need not conclude that plaintiff will definitely lose on the merits, only that he has not met the demanding burden of showing a clear entitlement to immediate, extraordinary relief. *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013).

As discussed in detail above, plaintiff cannot show a likelihood of success on the merits for any of the claims he has raised. *See* Argument Section II. On this factor alone the Court should deny plaintiff's motion for a PI. *See Kiyemba*, 561 F.3d at 513.

---

[9]  The District does not concede that plaintiffs' asserted damages were in fact a consequence of the Moratorium. *See*, *e.g.*, Argument Section II.B.1 (compensation for alleged damages to property or fines are not recoverable in any claim plaintiff might pursue under the challenged provisions of District law).

**B.**   **Plaintiff Failed To Demonstrate That He Will Suffer Imminent Irreparable Harm Absent Court-Ordered Relief.**

Plaintiff also fails to show any likelihood of imminent, irreparable harm. "The failure to demonstrate irreparable harm is grounds for refusing to issue a preliminary injunction, even if the other three factors … merit such relief." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quotation marks omitted). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (citations and internal quotation marks omitted). All three arguments plaintiff proffers for irreparable harm fall flat.

First, plaintiff asserts that a court can "presume irreparable harm" whenever a constitutional claim is alleged. Pl.'s Mem. at 25. Although he cites to *Winter* for that proposition, *Winter* says no such thing—and the language plaintiff quotes appears nowhere in the Supreme Court's opinion. Rather, plaintiff bears the burden of showing that—separate and apart from the merits—he faces "certain" harm that is "great and actual" absent a PI. *See Leavitt*, 404 F. Supp. 2d at 204; *see also Winter*, 555 U.S. at 20 (preliminary relief requires showing of all four factors). "[T]he deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely." *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018). Here, plaintiff has failed to show the likelihood of any infringement of his constitutional rights. Because plaintiff is unlikely to succeed on

the merits of his constitutional claim, *see* Argument Section II above, he cannot show irreparable harm by violation of a constitutional right. *Beberman*, 2019 WL 5653626 at n.5 (citing *Brown v. FEC*, 386 F. Supp. 3d 16, 33 (D.D.C. 2019)).

Second, plaintiff contends he faces irreparable harm because he "is unable to take any action to regain possession of his property." Pl.'s Mem. at 25. This, too, is a non-starter. Plaintiff nowhere contends that he has attempted to file an eviction action, let alone the outcome of what any such action might be. Just as plaintiff has no certainly impending injury, *see* Argument Section I.A.1 above, he cannot show he faces irreparable harm based on conjecture about what will happen in a case he has not filed.

Finally, plaintiff points to alleged damage to his property caused by his current tenant that "needs to be remedied immediately." Pl.'s Mem. at 26. But this cannot suffice to establish irreparable harm for an obvious reason: Property damage is not irreparable. Plaintiff does not explain why damage done to his property cannot be fully remedied by money damages. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also CFGC*, 454 F.3d at 297-98 ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.") (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Moreover, plaintiff has the legal right to enter his property and repair damage with or without an injunction. D.C. Code § 8-231.06(a).

Plaintiff faces no imminent irreparable harm that injunctive relief could remedy. This factor militates against granting a PI.

C.   **The Balance of the Equities and Public Interest Counsel Against Injunctive Relief.**

Finally, the balance of the equities and the public interest weigh decidedly against plaintiff here. Even if plaintiff could show a likelihood of success on the merits and that irreparable harm would result without preliminary relief, he must show both that "the balance of equities tips in [his] favor," and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two factors "merge when the Government is the opposing party" and are thus analyzed together. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (citation and internal quotation marks omitted).

For starters, plaintiff's allegations, even if true, do not constitute an emergency. Notably, pieces of the challenged Moratorium have been in place since March 2020, and plaintiff alleges that his disputes with his tenant arose in the summer of 2020. *See* Am. Compl. ¶ 23. If plaintiff's perceived inability to file an eviction suit or to evict his tenant was truly an emergency requiring immediate relief, he would have filed this lawsuit when that situation first arose. Instead, plaintiff made no efforts in the ensuing months to bring this challenge and has not pointed to any imminent harm that requires immediate intervention by the Court. Having chosen to sit on his rights, plaintiff now asks the Court to enjoin the enforcement of District legislation and allow housing providers across the District to evict tenants while COVID-19 cases continue to remain elevated. Such extraordinary relief is not

warranted, especially given plaintiff's weak evidentiary showing of harm.

As discussed, plaintiff's alleged inability to evict his tenant cannot be redressed by the Court in this action. *See* Argument Section I.A.2; Pl.'s Mem. at 34-35. And any other harms alleged, including the ongoing property damage allegedly being caused by his tenant, are also not irreparable. *See* Argument Sections II.B.1, III.B. Indeed, plaintiff apparently *already* has enough than money to cover the expenses he *may* have actually paid out of pocket to repair the damage allegedly done by his tenant. SUMF ¶¶ 27, 20, 31 (plaintiff's property insurance has a $500 deductible, plaintiff's Lease requires his tenant to indemnify him for any damage to the property, and plaintiff has a $1,244 security deposit he may apply to "monies owed by the Tenant" for "damages").

But even assuming the various hardships plaintiff alleges are imminent and irreparable, and that the order he seeks would help him, the equities still favor denying preliminary relief. The Council made a legislative determination that the Moratorium is the best way to protect the health and safety of District residents during this unprecedented public health emergency. Plaintiff's policy disagreement with the elected branches of local government does not warrant federal court intervention. *See TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 841 (W.D. Tenn. 2020) (finding balance of hardships weighed against TRO enjoining local restaurant closure order during pandemic, reasoning that "the costs imposed on Plaintiffs by the local government's Closure Order can only be remedied by local government through its executive and legislative branches"); *Carmichael v. Ige*, 470 F. Supp. 3d 1133, 1151

(D. Haw. 2020) (declining to enjoin Hawaii's quarantine requirement, observing that "[i]n these unprecedented times, it is not the Court's role to second-guess the decisions of state officials who have the expertise to assess the COVID-19 pandemic and institute appropriate measures to minimize its impact to this community").

And whatever hardships plaintiff might incur are vastly outweighed by the District's need to ensure stable housing for all of its residents and especially for those most vulnerable during the pandemic. Empirical evidence has shown that eviction moratoria help to limit the spread of COVID-19, and to save lives, and that the effect is stronger when moratoria reach the early stages of eviction proceedings. SUMF ¶¶ 32, 33. Given the highly infectious nature of COVID-19, enjoining enforcement of the Moratorium would jeopardize the safety and well-being of evicted tenants, other residents they may be forced to live with and, indirectly, all residents. *See* SUMF ¶¶ 5, 6, 14, 15, 16, 19, 22, 23, 32, 33. Such consequences are indisputably not in the public interest. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[C]ourts … should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). And plaintiff's requested relief would not be equitable. In effect, plaintiff is asking the Court to put the lives of District residents at risk so that he *might* avoid some future damage to his property, which may or may not occur, and which could, in any event, be fully remedied with money damages he would likely be entitled to under the provisions of his own Lease.

Plaintiff tries to downplay the effect his requested remedy would have, arguing that the recent eviction restrictions imposed by the CDC "will act as a backstop." Pl.'s

Mem. at 28. But as plaintiff acknowledges, the CDC's Moratorium is much less comprehensive than the District's. *See id.*; *see also* 85 Fed. Reg. at 55,293 (defining "covered person" under moratorium). The CDC Moratorium was designed to apply nationwide; it was not designed to address the needs of a dense, entirely urban community like the District.[10] Enjoining the District's Moratorium would permit a vast number of eviction actions currently prohibited, jeopardizing the housing security of numerous tenants whose evictions would pose a risk to all District residents. The individual financial hardships plaintiff alleges here cannot outweigh the dire health risks preliminary relief would impose on the community. *See Auracle Homes, LLC v. Lamont*, — F. Supp. 3d —, 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) (finding balance of the equities and public interest favored denying injunction of Connecticut eviction moratorium despite hardships to businesses in light of "devastating health consequences for low-income communities" and "disastrous increase in homelessness and virus exposure that would disproportionately impact renters of color" if an injunction were granted).

The balance of the equities and the public interest weigh steeply in the District's favor and against granting injunctive relief.

---

[10]     The District is, of course, far more densely settled than the nation as a whole. *See* U.S. Census Bureau, "2010 Census: Population Density Data," https://www.census.gov/data/tables/2010/dec/density-data-text.html (2010) (showing, as of 2010, nationwide population density of 87.4 people per square mile, and density in the District of Columbia at 9,856.5 people per square mile).

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's Motion, and grant the District's cross-motion for summary judgment or, in the alternative, to dismiss plaintiff's Amended Complaint.

Dated:  February 5, 2021.          Respectfully submitted,

                                   KARL A. RACINE
                                   Attorney General for the District of Columbia

                                   TONI MICHELLE JACKSON
                                   Deputy Attorney General
                                   Public Interest Division

                                   */s/ Fernando Amarillas*
                                   FERNANDO AMARILLAS [974858]
                                   Chief, Equity Section

                                   */s/ Mateya B. Kelley*
                                   MATEYA B. KELLEY [888219451]
                                   MICAH BLUMING [1618961]
                                   Assistant Attorneys General
                                   ANDREW J. SAINDON [456987]
                                   Senior Assistant Attorney General
                                   400 Sixth Street, N.W., Suite 10100
                                   Washington, D.C. 20001
                                   Phone: (202) 724-7854
                                   Fax: (202) 730-0626
                                   mateya.kelley@dc.gov
                                   micah.bluming@dc.gov
                                   andy.saindon@dc.gov

                                   *Counsel for the District of Columbia*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARL D. NEFF, | |
| Plaintiff, | |
| v. | Civil Action No. 20-03531 (KBJ) |
| MURIEL BOWSER, *et al.*, | |
| Defendants. | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendants the District of Columbia and Mayor Muriel Bowser (collectively, the District) submit the following Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Summary Judgment:

1.    A nationwide public health emergency, resulting from the 2019 Novel Coronavirus, has existed since January 27, 2020. U.S. Dep't H.H.S., "Determination that a Public Health Emergency Exists" (Jan. 31, 2020), https://tinyurl.com/y3zrs5u9.

2.    On March 11, 2020, the World Health Organization declared COVID-19, the disease caused by the Novel Coronavirus, to be a pandemic. Ex. A, Mayor's Order No. 2020-046, at 1.

3.    On March 11, 2020, Mayor Muriel Bowser declared a public health emergency in the District. *Id.*

4.    The Mayor's declaration now extends through at least March 31, 2021. Ex. D, Mayor's Order 2020-127, at 3.

5.     COVID-19 "spreads very easily and sustainably between people who are in close contact," and may be spread by individuals exhibiting no symptoms. Temporary Halt in Residential Evictions to Prevent Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020) (CDC Moratorium, attached to Neff. Decl. [6-2], as Ex 10., [6-3] at 93). "Severe" cases may require hospitalization or intensive care and may be fatal. *Id.*

6.     To slow the spread of the virus, individuals must maintain a distance of at least six feet from other people, and those confirmed or suspected of infection should be in total isolation. CDC, "How to Protect Yourself & Others" (Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

7.     In response to this threat, "Federal, State, and local governments have taken unprecedented or exceedingly rare actions, including border closures, restrictions on travel, stay-at-home orders, mask requirements, and eviction moratoria." CDC Moratorium, 85 Fed. Reg. at 55,292.

8.     From March 30, 2020 to May 29, 2020, the Mayor ordered all District residents to remain in their homes except for limited outings. Ex. B, Mayor's Order No. 2020-054, at 2; Ex. C, Mayor's Order No. 2020-067, at 3.

9.     As of February 2, 2021, the virus has infected 26,160,210 people and killed 441,831 within the United States. *See* CDC, "COVID Data Tracker," https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last accessed Feb. 3, 2021).

10.     As of February 2, 2021, the virus has infected 37,199 District residents and 926 have died. Gov't of the District of Columbia, "COVID-19 Surveillance, as of February 2, 2021," https://coronavirus.dc.gov/data.

11.     The percentage of District residents unemployed more than doubled from 5.1% in February to 11.7% in April 2020. U.S. Bureau of Labor Statistics, "Local Area Unemployment Statistics" (Nov. 2, 2020), https://bit.ly/3kN08kC.

12.     Eviction is a cause, not just a condition, of poverty. *See* Ex. E, Council for the District of Columbia, Public Roundtable Regarding Tenant Protection and Eviction Prevention, Sept. 14, 2020 (statement of Beth Mellen Harrison), at 6-8 (citing Matthew Desmond, Evicted: Poverty and Profit in the American City (2016)) (Mellen Testimony); Ex. F, Matthew Desmond, Eviction and the Reproduction of Urban Poverty, 18 Am. J. of Sociology 1, 91 (July 2012); Ex. G, Allyson E. Gold, No Home for Justice: How Eviction Perpetuates Health Inequity among Low-Income and Minority Tenants, 24 Geo. J. on Poverty L. & Pol'y 59, 66-69 (2016).

13.     Many landlords will not rent to persons who have had an eviction filed against them. Ex. G, Gold, 24 Geo. J. on Poverty L. & Pol'y at 66–68; Ex. H, Brian J. McCabe *et al.*, McCourt School of Public Policy, "Eviction in Washington D.C.", at 31-32 (Fall 2020) (McCourt Report) (same, specific to the District of Columbia).

14.     Large numbers of individuals living in any single setting facilitates the spread of COVID-19. CDC Moratorium, 85 Fed. Reg. at 55,296.

15.     "[E]victions threaten to increase the spread of COVID-19 as they force people to move, often into close quarters in new shared housing settings with friends

3

or family, or congregate settings such as homeless shelters." CDC Moratorium, 85 Fed. Reg. at 55,296; Ex. G, Gold, 24 Geo. J. on Poverty L. & Pol'y at 69.

16.     Living on the streets further increases the risk someone will experience a severe illness from COVID-19. CDC Moratorium, 85 Fed. Reg. at 55,296.

17.     Before the current public health emergency, the D.C. Superior Court's Landlord and Tenant Branch docket exceeded 30,000 eviction cases annually. District of Columbia Courts, District of Columbia Courts' Statistical Summary, CY 2019 (2020), at 8-9, *available at* https://www.dccourts.gov/about/organizational-performance/annual-reports (last accessed Jan. 31, 2021).

18.     Tenants sometimes move upon receiving a notice to vacate, even if they may have a valid legal defense to eviction. D.C. Res. 23-519, § 2; Ex. N, Council for the District of Columbia, Public Roundtable, Examining the District's Legislative Prohibitions on Evictions During the COVID-19 Pandemic, Feb. 4, 2021 (statement of Daniel Palchick), at 2-3; *id.* (statement of Johanna Shreve).[1] Alana Semuels, *Renters Are Being Forced From Their Homes Despite Eviction Moratoriums Meant to Protect Them*, Time (Apr. 15, 2020), *available at* https://time.com/5820634/evictions-coronavirus/; Meena Venkataramanan and Juan Pablo Garnham, *Undocumented Immigrants Behind on Their Rent Are Self-Evicting*

---

[1]     Ms. Shreve testified before the Council on February 4, 2021, one day before this document was filed. No written statement is currently available, but Ms. Shreve's testimony is expected to appear on the Council's website shortly, as part of the archived video of the hearing. *See* Council of the District of Columbia, Council Videos, https://dccouncil.us/council-videos/ (last accessed Feb. 5, 2021).

4

*Across Texas*, The Texas Tribune (July 22, 2020), *available at* https://tinyurl.com/y6qh54mk/.

19.     An August 2020 study using recent Census survey data "estimate[s] that approximately one-third of District families—between 51,000 to 57,000 households, or 118,000 to 131,000 individuals—are at risk of eviction because of the pandemic." Ex. E, Mellen Testimony at 3 (citing Census Bureau table).

20.     Most tenants who have faced eviction in recent years (2014-2018) are in relatively low-income housing:  Approximately a quarter of all households facing eviction have subsidized housing, and nearly two-thirds owe less than the median rent ($1,487) in the District when they are summoned to court. Ex. H, McCourt Report at 21-23.

21.     Demand for subsidized and low-income housing in the District far exceeds supply. Ex. E, Mellen Testimony at 2-3; Ex. H, McCourt Report at 21-22.

22.     Displacement of residents by eviction would likely increase the spread of COVID-19 in the District. CDC Moratorium, 85 Fed. Reg. at 55,294-55,296.

23.     The overlapping, negative consequences of eviction—and the dangers of COVID-19—disproportionately affect communities of color and other vulnerable populations. *See, e.g.*, Ex. E, Mellen Testimony at 1; Ex. I, ReOpen DC Advisory Group, Equity and Vulnerable Populations Committee, Recommendations (May 21, 2020); *id.* at 18, 20; Ex. H, McCourt Report at 29.

24.     Plaintiff owns residential property located in the District of Columbia. Neff Decl. [6-2] ¶ 1.

25.    In January 2019, plaintiff executed a lease of that property (the Lease), with a tenant who remains unnamed in this action. Neff Decl., Ex. 1, [6-3] at 2.

26.    Under Paragraph 1 of the Lease, plaintiff is entitled to receive rent in monthly installments. *Id.*

27.    Under Paragraph 5 of the Lease, plaintiff received and retains a security deposit of $1,244.00, which he may elect to apply "to monies owed by the Tenant" for rent "or damages." *Id.* at 3.

28.    Under Paragraph 13 of the Lease, plaintiff's tenant "shall be responsible for any fines by any governmental agency" resulting from "any unreported malfunctions or misuse" of any smoke detectors or carbon monoxide alarms. *Id.* at 6.

29.    Under Paragraph 18 of the Lease, plaintiff's tenant "must indemnify and save [him] harmless from any and all loss, claim or damage by reason of any accident, injury, or damage to any person or property occurring anywhere on or about the leased premises which is in exclusive control of the" tenant. *Id.* at 7.

30.    Mr. Neff holds an insurance policy that covers certain damage done to the property subject to the Lease. Neff Decl., Ex. 4, [6-3] at 24.

31.    The policy has a $500 deductible. *Id.*

32.    Empirical studies examining the relationship between COVID-19 and eviction controls have shown that eviction moratoria reduce the spread of COVID-19 and related deaths. *See* Ex. J, Emily A. Benfer, David Vlahov, *et al.*, "Eviction, Health Inequity, and the Spread of COVID-19: Housing Policy as a Primary Pandemic Mitigation Strategy" (Nov. 2020), at *6-7 (citing K.M. Leifheit, S.L. Linton, *et al.*,

"Expiring Eviction Moratoria and COVID-19 Incidence and Mortality: Evidence from a Natural Experiment" (2020), attached as Ex. K); Ex. L, Council for the District of Columbia, Public Roundtable, Examining the District's Legislative Prohibitions on Evictions During the COVID-19 Pandemic, Feb. 4, 2021 (statement of Craig Pollack), at 1-2; Ex. M, Nat'l Bureau of Economic Research, Kay Jowers, *et al.*, "Housing Precarity & The COVID-19 Pandemic: Impacts of Utility Disconnection and Eviction Moratoria on Infections and Deaths Across U.S. Counties" (January 2021), at 10-11.

33.     Empirical research has shown that removing restrictions on eviction filings and serving notices to vacate correlates with an increase and mortality rate of COVID-19. *See* Ex. K at 17.

34.     Most plaintiffs filing for eviction in the District are represented by legal counsel, but most tenants defending against an eviction action are not represented by counsel. Ex. H at 27.


Dated:  February 5, 2021.          Respectfully submitted,

                                   KARL A. RACINE
                                   Attorney General for the District of Columbia

                                   TONI MICHELLE JACKSON
                                   Deputy Attorney General
                                   Public Interest Division

                                   */s/ Fernando Amarillas*
                                   FERNANDO AMARILLAS [974858]
                                   Chief, Equity Section

                                   */s/ Mateya B. Kelley*
                                   MATEYA B. KELLEY [888219451]
                                   MICAH BLUMING [1618961]

Assistant Attorneys General
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
Phone: (202) 724-7854
Fax: (202) 730-0626
mateya.kelley@dc.gov
micah.bluming@dc.gov
andy.saindon@dc.gov

*Counsel for Defendants*

8

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CARL D. NEFF,<br><br>          Plaintiff,<br><br>v.<br><br>MURIEL BOWSER, *et al.*,<br><br>          Defendants. | Civil Action No. 20-03531 (KBJ) |

## ORDER

Upon consideration of plaintiff's motion for preliminary injunction and summary judgment (Motion), defendants' cross-motion for summary judgment or, in the alternative, to dismiss plaintiff's Amended Complaint (Cross-Motion), and the entire record, it is this _____ day of _____, 2021,

**ORDERED** that plaintiff's Motion is **DENIED**, and it is further

**ORDERED** that defendants' Cross-Motion is **GRANTED**, and it is further

**ORDERED** that **SUMMARY JUDGMENT** is entered in favor of defendants on all claims in plaintiff's Amended Complaint.

**SO ORDERED**.

_____
THE HONORABLE KETANJI BROWN JACKSON
Judge, United States District Court
          for the District of Columbia

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARL D. NEFF,<br><br>                    Plaintiff,<br><br>v.<br><br>MURIEL BOWSER, *et al.*,<br><br>                    Defendants. | Civil Action No. 20-03531 (KBJ) |

## ORDER

Upon consideration of plaintiff's motion for preliminary injunction and summary judgment (Motion), defendants' cross-motion for summary judgment or, in the alternative, to dismiss plaintiff's Amended Complaint (Cross-Motion), and the entire record, it is this _____ day of _____, 2021,

**ORDERED** that plaintiff's Motion is **DENIED**, and it is further

**ORDERED** that defendants' Cross-Motion is **GRANTED**, and it is further

**ORDERED** that plaintiff's Amended Complaint is **DISMISSED**.

**SO ORDERED**.

_____
THE HONORABLE KETANJI BROWN JACKSON
Judge, United States District Court
        for the District of Columbia